UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| **AZRA BASIC,** | **CIVIL ACTION NO. 5:12-cv-274-KKC** |
| **Petitioner,** | |
| **V.** | **OPINION AND ORDER** |
| **TIMOTHY STECK, acting United States Marshal, Eastern District of Kentucky,** | |
| **Respondent.** | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on a petition for writ of habeas corpus filed by Petitioner Azra Bašić. (DE 1).[1] On July 27, 2012, the Magistrate Judge certified to the Secretary of State that Bašić is subject to extradition under 18 U.S.C. § 3184. Bašić filed the instant petition on August 28, 2012 challenging the Magistrate Judge's finding. For the following reasons, Bašić's petition for writ of habeas corpus will be denied.

## I. Background

### A. Factual Overview

Centuries of conquest created significant ethnic and religious diversity throughout the Balkan peninsula. Ethnic Bosnians, Croats, and Serbs all lived in—and claimed an ancestral right to—the same land; and, though the communist regime of the Socialist Federal Republic of Yugoslavia ("SFRY") united these peoples, its disintegration bred widespread fear that each ethnic group would not be protected. Carole Rogel, *The Breakup of Yugoslavia and the War in Bosnia* 44–48 (1998). This fear fueled an arms race among

---

[1] Not all materials from the extradition record are included in the habeas corpus record; therefore, citations to the habeas corpus record will commence "DE" and citations to the extradition record will commence "5:11-5002 DE."

territorial and local defense units, usually divided along ethnic lines, because the Serbs used and manipulated the Yugoslav National Army ("YNA") to advance their interests. *Id.* at 23–24. Civil war commenced as SFRY's republics announced their independence. *Id.* at 25.

Ethnic cleansing was an explicit Serbian war policy. *Id.* at 33. Serbs harassed and terrorized civilians to encourage non-Serb inhabitants to flee; those who stayed were subjected to torture, rape, mutilation, and murder. *Id.* In response, "[t]he early victims adopted the aggressors' tactics in dealing with the enemy." *Id.* at 35.[2]

Azra "Issabel" Bašić was born on June 22, 1959 in Rijeka, Croatia, the daughter of a Croatian Catholic mother and Bosnian Muslim father. During the conflict arising from the disintegration of the Yugoslavia, it is undisputed that Bašić joined the Croatian army. It is also undisputed that on April 26, 1992, Croat groups entered the village of Čardak, in present-day Bosnia and Herzegovina ("Bosnia"), and took dozens of ethnic Serbian civilians hostage. Many of the hostages were taken to a former YNA Centre in the nearby town of Derventa.

Bašić is alleged to have served as a supervisor of the Croatian forces guarding the Serbian civilians at the YNA Centre in Derventa. Witnesses describe a horrific scene.[3] The

---

[2] There is no evidence of ethnic or religious tension in the Balkan peninsula until the Nazis brought their genocidal policies to the region. Rogel, *supra*, at 47. During the Second World War, Croats ruled an "independent" fascist satellite that singled out Serbs for execution, deportation, or conversion to Catholicism. *Id.* at 48. "Hate begets hate; violence begets violence; toughness begets a greater toughness." Martin Luther King, Jr. and Clayborne Carson, *Stride Toward Freedom: The Montgomery Story* 74 (2010).

[3] Luka Patković gave a statement on October 14, 1994 under the penalty of perjury where he testified about what occurred at the Derventa YNA Centre. Patković stated:

> Right after we came to the YNA Centre they continued beating us with [the] butts [of their guns], legs and arms. In my case, they put a knot from the rope in my mouth and ordered me to close my mouth, and then one Croatian soldier led [me like a] dog through the rooms and the other two sat on my back and I carried them. I was beaten up

Serbian hostages were tortured and humiliated, and some of the hostages were murdered. Germane to the present matter, witnesses allege that Bašić murdered Blagoje Đjuraš and tortured Mile Kuzmanović, Čedo Marić, and Sreten Jovanović.

## B. Procedural History

On February 1, 2007, the Republic of Bosnia and Herzegovina submitted a formal request to the U.S. Department of State seeking the extradition of Azra Bašić. In support of its extradition request, Bosnia provided the formal "Criminal Charge" for Bašić, dated January 12, 1993; minutes from formal hearings under oath; sworn witness statements; and medical records. The United States Consul in Bosnia authenticated these documents.

In 2009, the United States requested additional information to verify Azra Bašić's identity as the alleged perpetrator of the crimes listed in the "Criminal Charge." On February 15, 2010, Bosnia submitted records from six witness interviews where each witness inspected a photo array and identified Bašić's photo as the perpetrator, and Bosnia supplied a "Special Report" prepared by local prosecutors providing additional information concerning Bašić's identity on April 7, 2010. The State Department authenticated both supplements.

On March 9, 2011, the United States filed a complaint, on behalf of the Bosnian government, seeking Bašić's extradition. The United States Marshals then arrested Bašić pursuant to a complaint-based arrest warrant. Bašić moved to dismiss the extradition

---

with everything and anything, so I was covered in blood. They treated
all the other prisoners like that, and there were 28 of us from the
settlement Čardak. They put salt into our mouth and wounds. That
created unbearable thirst and pain. They burned us with cigarettes
all over our bodies, but previously they had ordered us to strip and
then they beat us and burned us with cigarettes.

(5:11-5002 DE 1-11 at 75) (Statement of Patkovic). Patković also testified that the Croatian guards carved the letter "S" into some of the hostages' skin, and guards also used other objects—such as pliers—to torture the hostages. *Id.*

complaint arguing that no valid extradition treaty exists between the United States and Bosnia; that Bašić, as a United States citizen, could not be extradited under any alleged treaty between the United States and Bosnia; that her prosecution in Bosnia is time-barred; and that Bosnia did not provide a duly authenticated warrant of arrest.

The Magistrate Judge held numerous hearings and conferences before filing an Opinion and Order granting the Government's application for a certificate of extraditability. *In re Extradition of Azra Basic*, No. 5:11-5002, 2012 WL 3067466 (E.D. Ky. July 27, 2012). The Magistrate Judge found that the 1902 extradition treaty between the United States and the Kingdom of Serbia applied and that United States citizens could be extradited under the extradition treaty. *Id.*, at *1 n.6. He also concluded that Bašić's prosecution was not time-barred, that Bosnia provided the "functional equivalent" of a duly authenticated warrant of arrest, and that the evidence provided probable cause to believe that Bašić murdered Blagoje Đuraš and tortured Mile Kuzmanović and Čedo Marić. *Id.*, at *7, 10, 14–15.

On August 28, 2012, Bašić filed a petition for a writ of habeas corpus. Bašić challenges the certificate of extraditability on six grounds: (1) there is no valid extradition treaty between the United States and Bosnia; (2) the 1902 extradition treaty between the United States and the Kingdom of Serbia prevents extradition of United States citizens; (3) the applicable statute of limitations has expired; (4) Bosnia did not produce a valid warrant of arrest; (5) there is not probable cause to believe each element of the crimes for which extradition is requested; and (6) the rule of specialty prohibits extradition. The Court will address each argument in turn, but the Court finds that Bašić's petition must be denied.

## II. Discussion

### A. Standard of Review

Bašić now files this petition for writ of habeas corpus claiming that, by means of the extradition proceedings, she has been placed "in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus relief from an extradition certification is confined to three areas of inquiry: "[(1)] whether the magistrate [judge] had jurisdiction; [(2)] whether the offense charged is within the treaty; and, [(3)] by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Habeas corpus is not a writ of error, and is "not a means for rehearing what the magistrate has already decided." *Id.*

Factual findings are reviewed for clear error; however, legal determinations are reviewed *de novo. Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011). Additionally, the principles of international comity and judicial modesty caution against analyzing foreign law and foreign criminal procedure, except to ensure that the United States and the requesting country satisfy the requirements of the extradition statute. *Id.* at 156.

### B. The Magistrate Judge had jurisdiction.

There are four elements of a magistrate's jurisdiction to certify an individual as subject to extradition, including: (1) a treaty or convention for extradition between the United States and the requesting country; (2) the requesting country must submit a complaint under oath; (3) the complaint must charge a person living within the magistrate's territorial jurisdiction; and, (4) the complaint must charge that person with committing one or more of the crimes enumerated under the treaty or convention. 18 U.S.C. § 3184; *see also*

*Demjanjuk v. Petrovsky*, 776 F.2d 571, 579–83 (6th Cir. 1985) (noting the multiple jurisdictional requirements for international extradition), *vacated*, 10 F.3d 338 (6th Cir. 1993) (finding prosecutorial misconduct).

*1. A valid extradition treaty between the United States and Bosnia exists.*

Bašić contends that there is not a valid extradition treaty between the United States and Bosnia. Bosnia, in making its extradition request, relied upon an extradition treaty ratified in 1902 by the United States and the Kingdom of Serbia ("the Treaty").[4] Bašić argues that the Treaty does not apply because Bosnia is not a "successor state" to the Kingdom of Serbia and Bosnia has not demonstrated that it intends to be bound by the Treaty.

Bašić's claim relies upon a number of technical arguments. Bašić notes that Bosnia was not affiliated with Serbia at the time the treaty was enacted or at the time the alleged acts occurred. Bašić also asserts that, during the Yugoslavia's communist regime, Bosnia and Serbia were not united but were "unitary republics." Bašić further remarks that Bosnia's constitution divorces itself from Yugoslavia; thus Bašić claims that Bosnia is a "breakaway" from, not a "successor" to, Yugoslavia. Finally, Bašić contends that the Treaty does not apply because Bosnia has not demonstrated that it intends to be mutually bound by the Treaty. The Court finds these arguments in error and that the Treaty applies.[5]

---

[4] The applicable treaty was signed on October 25, 1901; ratified by the United States Senate on January 27, 1902; signed by President Theodore Roosevelt on March 7, 1902; and entered into force on June 12, 1902. Treaty between the United States and Servia for the Mutual Extradition of Fugitives from Justice, U.S.-Serb., Oct. 25, 1901, 32 Stat. 1890 [hereinafter *the Treaty*].

[5] The Court notes that the Treaty's validity may be analyzed under the political question doctrine or the state succession doctrine. Each doctrine, individually, may uphold the Treaty's validity, but the Court finds that both theories recognize an extradition treaty between the United States and Bosnia.

<u>a) The existence of a valid extradition treaty between the United States and Bosnia is a political question.</u>

"[T]he question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and . . . the courts ought not to interfere with the conclusions of the political department in that regard." *Terlinden v. Ames*, 184 U.S. 270, 288 (1902) (considering whether the 1852 extradition treaty between the United States and the Kingdom of Prussia could validly apply to the German Empire in 1901). In *Terlinden*, the Supreme Court squarely held that, in addressing whether an extradition treaty remains in force, courts should defer to the political branches. *See also Meza v. United States Att'y Gen.*, 693 F.3d 1350, 1358 (11th Cir. 2012) (holding that whether a treaty remains in force following a political change within one of the signatories is a political question that courts should defer to each nations' political branches); *Hoxha v. Levi*, 465 F.3d 554, 562 (3d Cir. 2006) (same); *Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*, 177 F.3d 1142, 1145 (9th Cir. 1999) (same); *New York Chinese T.V. Programs, Inc. v. U.E. Enters., Inc.*, 954 F.2d 847 (2d Cir. 1992) (same); *Sabatier v. Dabrowski*, 586 F.2d 866, 868 (1st Cir. 1978) (same); *Argento v. Horn*, 241 F.2d 258, 262–63 (6th Cir. 1957) (same). Accordingly, this Court defers to the executive branch, as a political question, to determine whether an enforceable extradition treaty between the United States and Bosnia exists.

Here, both governments assert that the Treaty applies. Patricia McDonough, an Attorney-Adviser for the Department of State, declared that the United States finds that the Treaty is in full force and effect between the United States and Bosnia. (DE 18-5 at 2–3.) Slobodan Kovač, Minister of Justice for Bosnia and Herzegovina, also pronounced that

the Treaty applies.[6] (5:11-5002 DE 1-12 at 2.) This Court will not interfere with these consistent conclusions. *Terlinden*, 184 U.S. at 288.

<u>b) The Treaty is valid under the state succession doctrine.</u>

The Treaty is also valid because Bosnia has assumed the rights and obligations of the Treaty through a series of state successions. A "'successor state' . . . includes a state that wholly absorbs another state, that takes over part of the territory of another state, that becomes independent of another state . . . or that arises because of the dismemberment of the state of which it had been a part." Restatement (Third) of Foreign Relations Law of the United States § 208 cmt. b. (1987). A successor state, however, does not include a "mere change in the regime or in the form of government or its ideology." Restatement, § 208 cmt. a.

The state succession doctrine is articulated in the Restatement (Third) of Foreign Relations Law as follows:

> (1) When part of the territory of a state becomes territory of another state, the international agreements of the predecessor state cease to have effect in respect of that territory and the international agreements of the successor state come into force there.
>
> (2) When a state is absorbed by another state, the international agreements of the absorbed state are terminated and the international agreements of the absorbing state become applicable to the territory of the absorbed state.
>
> (3) When part of a state becomes a new state, the new state does not succeed to the international agreements to which the predecessor state was party, *unless, expressly or by implication, it accepts such agreements and the other party or parties thereto agree or acquiesce.*

---

[6] This assertion is consistent with a declaration by President Alija Izetbegović, the first Bosniak President of the Republic of Bosnia and Herzegovina, in April 1992 stating that "Bosnia-Herzegovina is ready to fulfill the treaty and other obligations of the former [Yugoslavia]." (5:11-5002 DE 39-5 at 5 (April 19, 1992 letter from President Izetbegović to the United States Department of State)) [hereinafter *President Izetbegović Letter*].

> (4) Pre-existing boundary and other territorial agreements continue to be binding notwithstanding Subsections (1)–(3).

Restatement, § 210 (emphasis added). Explicit and implicit succession equally support a treaty's ongoing validity. *Id.* A successor state explicitly succeeds to a treaty through official communications manifesting its consent and the other signators communicate their agreement. *Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004); Restatement § 210 cmt. g. A successor state and the other signators to a treaty demonstrate implicit succession through continued adherence to the treaty's provisions. *See Terlinden*, 184 U.S. at 288; Restatement, § 210 cmt. g.

The political history of the Balkan peninsula between the Kingdom of Serbia and the Republic of Bosnia and Herzegovina is worthy of examination. As a consequence of the First World War, the Kingdom of Serbia became part of the "Kingdom of Serbs, Croats and Slovenes"—which encompassed the territory consisting of present-day Bosnia. Rogel, *supra*, at 8. In 1929, King Alexander changed the official state name to the "Kingdom of Yugoslavia;" and, after the Second World War, the communists proclaimed that the Kingdom of Yugoslavia had become the "Federal People's Republic of Yugoslavia" ("FPRY"). *Id.* at 10, 12. In 1963, a new constitution renamed the country the "Socialist Federal Republic of Yugoslavia" ("SFRY"), and Bosnia declared its independence in February 1992.[7] Rogel, *supra*, at 26.[8]

---

[7] There were, however, only two state successions—the Kingdom of Serbia to the former Yugoslavia and the former Yugoslavia to Bosnia and Herzegovina. *See* Restatement, § 208 cmt. b. The political changes within the former Yugoslavia, from the Kingdom of Serbs, Croats and Slovenes to the Kingdom of Yugoslavia to the FPRY to the SFRY were not state successions but a "mere change in the regime or in the form of government or its ideology." *See* Restatement, § 208 cmt. a.

[8] The Dayton Peace Agreement, accords that ended the war in Bosnia following its declaration of independence, endorsed a central Bosnia government and collective presidency but also recognized two political subdivisions: a Muslim-Croat federation—the Federation of Bosnia and Herzegovina— and Serbian republic—Republika Srpska. Rogel, *supra*, at 40. The Republika Srpska is an

The Treaty is valid between the United States and Bosnia because every successive state expressly accepted the Treaty. Restatement, § 210(3). The Kingdom of Serbs, Croats and Slovenes was a successor state to the Kingdom of Serbia because the Kingdom of Serbs, Croats and Slovenes absorbed territory from the Austro-Hungarian Empire, the Kingdom of Montenegro, the Kingdom of Serbia, and the Ottoman Empire. Rogel, *supra*, at 5–8.

On September 29, 1921, Secretary of State Charles Evans Hughes received an communique from the Yugoslav Charge d'Affaires stating: "'The Government of the Kingdom of the Serbs, Croats and Slovenes considers the treaties and conventions concluded between the Kingdom of Serbia and the United States as applicable to the whole territory of the Kingdom of the Serbs, Croats and Slovenes as constituted at the present.'" *Ivancevic v. Artukovic*, 211 F.2d 565, 571 (9th Cir. 1954) (quoting the letter to Secretary Hughes). In response to this communique, the Department of State declared that all of its treaties with the Kingdom of Serbia "were in force and applicable to the [Kingdom of Serbs, Croats and Slovenes], including territory not part of Serbia before the World War of 1914–18." *Id.* Therefore, the Treaty applied to the Kingdom of Serbs, Croats and Slovenes because the new state expressly accepted the Treaty and the United States acquiesced. *See Kasternova*, 365 F.3d at 986.

The Kingdom of Yugoslavia, the FPRY, and the SFRY (collectively "Yugoslavia") were successive governments that remained bound by the treaty; but all three governments also implicitly accepted the Treaty with acquiescence from the United States. The governments of Yugoslavia were not successive states because the Kingdom of Yugoslavia merely represented a name change, the FPRY signified a change in the form of government,

---

incorporated polity and not, as Petitioner contends, a distinct political entity. (DE 18 at 5.) Therefore, Petitioner's arguments conflating the Republic of Bosnia and Herzegovina with the Republic of Srpska are in error.

and the SFRY also merely represented a name change. These changes signify a succession of government, not state. *See* Restatement, § 208 cmt. a. Further, the governments of Yugoslavia implicitly accepted the Treaty because the United States and Yugoslavia continued to seek extradition under the Treaty. *See, e.g.*, *Ivancevic*, 211 F.2d at 572 (holding that the Treaty remained in force between the United States and the FPRY); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (same for the SFRY).

Bosnia was a successor state to Yugoslavia because it became "independent [from Yugoslavia] of which it had formed a part." Restatement, § 208 cmt. b. The Treaty applies to the new state for two reasons: (1) Bosnia expressly accepted the Treaty and the United States acquiesced; and (2) Bosnia and the United States have applied the Treaty to numerous extradition requests. First, on April 19, 1992, President Alija Izetbegović explicitly declared that Bosnia would fulfill Yugoslavia's treaty obligations. *See* President Izetbegović Letter, *supra*, at 5. The United States, in turn, has acknowledged that the Treaty applies to Bosnia. (DE 18-5 at 2.) Second, Bosnia and the United States implicitly accepted that the Treaty remained in full force and effect because Bosnia and the United States continued to seek extradition under the Treaty. *See, e.g.*, *Sacirbey v. Guccione*, 589 F.3d 52, 56 n.8 (2d Cir. 2009) (finding that the Treaty applies despite denying extradition); *Pajkanovic v. United States*, 353 F. App'x 183 (11th Cir. 2009) (applying the Treaty to affirm that the petitioner could be extradited); *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 983–85 (D. Or. 2011) (holding that Handanović was certified for extradition under the Treaty).

Because every successive state between the Kingdom of Serbia and the Republic of Bosnia and Herzegovina accepted the Treaty, the Treaty remains in full force and effect. This finding is in line with every court that has confronted this issue, all of which have

expressly or impliedly found the Treaty in effect between the United States and Bosnia. *See, e.g.*, *Sacirbey*, 589 F.3d at 56 n.8 (explicitly holding that the Treaty applies); *Pajkanovic*, 353 F. App'x at 185–87 (affirming a district court's denial of habeas relief that found that the Treaty applies); *Nezirovic v. Holt*, 990 F. Supp. 2d 606 (W.D. Va. 2014) (affirming a magistrate's extradition certification where the magistrate explicitly held that the Treaty applies); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 216–17 (N.D.N.Y. 2013) (explicitly holding that the Treaty applies); *Handanovic*, 829 F. Supp. 2d at 983–85 (same); *In re Extradition of Bilanovic*, No. 1:08-74, 2008 WL 5111846, at *3 (W.D. Mich. Dec. 3, 2008) (same); *United States v. Avdic*, No. 07-06, 2007 WL 1875778, at *6 (D.S.D. June 28, 2007) (same).

<u>c) United States citizens may be extradited under the Treaty.</u>

Bašić also argues that the Treaty explicitly exempts citizens from extradition. The Treaty provides that "[n]either of the high contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this Treaty." The Treaty, *supra*, art. V. In relying on *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936), Bašić asserts that there are two types of extradition treaties: those that permit the extradition of citizens and those that expressly exempt citizens. Bašić contends that the Treaty falls into the latter category because the Treaty does not provide an express grant of power to extradite citizens. *See id.* at 11–13. In comparison, the 1905 extradition treaty with Nicaragua states: "Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this convention, *but the executive authority of each shall have the power to deliver them up, if, in its discretion, it be deemed proper to do so.*" Nicaragua International Extradition Treaty with the United States, art. V, Mar. 1, 1905, 35 Stat. 1869 (emphasis added); *see also Valentine*, 299 U.S. at 12–13 (collecting treaties with similar language).

12

Bašić invokes the presumption of meaningful variation: different wording suggests different meaning. Bašić argues that because the Treaty's language exempts citizens from extradition without providing an express grant of power—like the language found in many other treaties from this time period—none exists.

But *Valentine* notes that the executive's power to extradite may be "given by act of Congress *or* by the terms of a treaty." 299 U.S. at 9 (emphasis added). In 1990, Congress enacted 18 U.S.C. § 3196, which provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

Section 3196, therefore, provides statutory authority to extradite citizens in the absence of an affirmative grant of power under the Treaty.

But Bašić contends that § 3196's grant of power is unconstitutional. Bašić asserts that § 3196 violates Article II of the United States Constitution because the grant of power to extradite citizens substantively amended numerous treaties, contravening the Treaty Clause. *See* U.S. Const. art. II, § 2, cl. 2. The Treaty Clause vests treaty power solely in the President with the Advice and Consent of the Senate—power that applies to the creation *and* significant modification of treaties. *New York Chinese TV Programs, Inc. v. U.E. Enters., Inc.*, 954 F.2d 847, 853 (2d Cir. 1992).

Section 3196, however, does not significantly modify the Treaty. *See generally Hilario v. United States*, 854 F. Supp. 165, 167–71 (E.D.N.Y. 1994) (analyzing the enactment and constitutionality of § 3196). The Treaty's plain language does not obligate the United States to extradite its own citizens—neither party is bound. Similarly, § 3196

13

does not obligate the United States to extradite its own citizens—the Secretary of State *may* surrender a citizen. Overall, § 3196 is a domestic statute that does not alter the rights guaranteed to either of the high contracting parties and thus does not modify the Treaty in contravention with the Treaty Clause.

Therefore, the Court finds that the Secretary of State may, in his discretion, extradite United States citizens under the Treaty.

*2. Bosnia submitted a complaint under oath.*

On February 1, 2007, Slobodan Kovač submitted a request for the extradition of Azra Bašić on behalf of the Republic of Bosnia and Herzegovina. (5:11-5002 DE 1-12 at 2). Bašić does not contest Slobodan Kovač's authority to file the complaint. *See Grin v. Shine*, 187 U.S. 181, 193–94 (1902).

*3. Bašić lived in the Eastern District of Kentucky.*

Bašić does not contest the magistrate's territorial jurisdiction. Prior to her detention, Bašić lived in the Eastern District of Kentucky. *See* 18 U.S.C. § 3184.

## C. Bašić's alleged offenses satisfy the Treaty requirements.[9]

Bašić contends that the alleged offenses are not subject to the treaty because the statutes of limitations have expired and Bosnia did not produce a valid warrant of arrest. The Treaty provides that: "[e]xtradition shall not be granted, in pursuance of the provisions of this Treaty, if legal proceedings or the enforcement of the penalty for the act committed by the person claimed has become barred by limitation, according to the laws of the country to which the requisition is addressed." The Treaty, *supra*, art. VII. The Treaty also requires individuals be "charged with or convicted of" one of the enumerated crimes. *Id.*, art. I.

---

[9] The fourth jurisdictional element mirrors the second area of habeas inquiry. The Court will address these issues simultaneously.

*1. Bašić's alleged offenses are not time barred.*

Bašić states, correctly, that the laws of the United States dictate the appropriate limitations period. *Id.*, art. VII; *see also Nezirovic v. Holt*, 990 F. Supp. 2d 606, 613 (W.D. Va. 2014). But Bašić claims that her prosecution would be precluded as untimely and that the Bosnian Criminal Charge was not sufficiently analogous to an American indictment to toll the limitations period. The Court rejects these arguments.

<u>a) The 1993 Criminal Charge tolled the applicable statutes of limitations.</u>

Although United States law controls the limitations period, the official acts of the requesting state dictate whether the limitations period may be tolled. *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009). The Restatement (Third) of Foreign Relations Laws provides:

> For purposes of applying statues of limitations to requests for extradition in accordance with Subsection (1)(d), the period is generally calculated from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, *or similar step in the requesting state*, or of the filing of the request for extradition, whichever occurs first.

Restatement (Third) of Foreign Relations Law of the United States § 476, cmt. e (1987) (emphasis added).

A "similar step" is not necessarily analogous to an American indictment. *Sainez*, 588 F.3d at 717. A similar step will toll the limitations period if it acts as a "functional equivalent" to properly initiate charges. *Id.* at 716–17; *Jhirad v. Ferrandina*, 536 F.2d 478, 480 (2d Cir. 1976). Whether a document acts as a functional equivalent to properly initiate charges is afforded deference. *See, e.g.*, *Skaftouros*, 667 F.3d at 156 ("Any arguments regarding the demanding country's compliance with its own laws, therefore, are properly reserved for the courts of that country."); *Sacirbey*, 589 F.3d at 65 (American judges should

"avoid[] unwarranted incursions into the fine details of foreign criminal procedure"); *Sainez*, 588 F.3d at 717 ("[W]e [do not attempt to analogize a Mexican arrest warrant to an American indictment] by adhering to our established approach of giving credence to foreign proceedings."); *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980) ("The court's refusal to review compliance with foreign criminal procedure is not a formalistic application of outmoded law. Rather, the narrow scope of review is based on respect for the sovereignty of other nations.").

Here, Bosnia issued a formal "Criminal Charge" against "Azra N.N." on January 12, 1993. (DE 18-8). Although the Charge does not state Azra's last name, the Charge includes details of Azra's gender, military association, city of origin, and alleged crimes. *Id.* Importantly, Bosnia declared that a Criminal Charge using "N.N." in place of a suspect's last name is sufficient to initiate a criminal prosecution. (5:11-5002 DE 37-1 at 1); (5:11-5002 DE 39-3 at 3). In deference to Bosnia's interpretation of its own criminal procedure, this Court finds that the Criminal Charged tolled the limitations period less than nine months after the alleged acts occurred.

### b) No limitations period applies to Đuraš's alleged murder.

Bašić was charged with Blagoje Đuraš's murder. Bašić asserts that the correct limitations period for a murder charge is five years—the general felony statute of limitations period. 18 U.S.C. § 3282. The government contends that, pursuant to 18 U.S.C. § 3281, no limitations period applies because murder is a capital offense. Bašić argues that the general felony limitations period should not be extended, pursuant to § 3281, because neither murder nor torture is an offense punishable by death *in Bosnia*.

But whether murder is a capital offense *in Bosnia* is inapposite. The Treaty expressly states that the limitations period is governed by the substantive law of the

surrendering country, not the requesting country. The Treaty, *supra*, art. VII. Murder is punishable by death in the United States; therefore, the limitations period is governed by § 3281. *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986) (Kennedy, J.) ("[A]t least for purposes of international extradition from the United States, murder is a capital offense falling under 18 U.S.C. § 3281 rather than 18 U.S.C. § 3282."); *see also In re Extradition of Martinez*, No. 3:13-2042, 2014 WL 199867, at *2 (M.D. Tenn. Jan. 17, 2014) (quoting now-Justice Kennedy's *Kraiselburd* opinion). Consequently, prosecution for Đjuraš's alleged murder is not barred by a limitations period.

<u>c) No limitations period applies to the alleged acts of torture.</u>

Bašić also asserts that the five-year statute of limitations period applies to the alleged acts of torture. Bašić notes that the Magistrate Judge determined that the longer limitations periods under the federal Torture Act, 18 U.S.C. § 3286, should not apply.[10] *Basic*, *supra*, at *14. The Magistrate Judge noted that the Torture Act, implementing the 1984 United Nations Convention against Torture, was not enacted until April 30, 1994 and concluded that applying the statutes of limitations from the Torture Act would violate *ex post facto* principles because the alleged acts occurred in April 1992. *Id.*

*Ex post facto* principles, however, do not apply to international extradition. *Ex post facto* principles apply solely to penal or criminal cases, *Carmell v. Texas*, 529 U.S. 513, 521–25 (2000) (discussing the common law origins of the prescription against *ex post facto* laws), and international extradition is a civil—not criminal—proceeding, *DeSilva v. DiLeonardi*, 181 F.3d 865, 868 (7th Cir. 1999); *see also United States ex rel. Oppenheim v. Hecht*, 16 F.2d

---

[10] The Magistrate Judge determined that the Bosnian Criminal Charge tolled the limitations period and that no statute of limitations barred extradition under the Treaty. *Basic*, *supra*, at *15–16.

955, 955 (2d Cir. 1927). Therefore, the statutes of limitations that are effective at the time the requesting country petitions for extradition control. *Oppenheim*, 16 F.2d at 955.

The Torture Act establishes an eight-year limitations period for torture, but no limitations period applies if the acts "resulted in, or created a forseeable [sic] risk of, death or serious bodily injury to another." 18 U.S.C. § 3286 (referencing 18 U.S.C. § 2332b(g)(5)(B) for a list of acts subject to the extended limitations period, including torture under 18 U.S.C. § 2340A). Because Bašić is alleged to have committed numerous acts of torture that created a foreseeable risk of serious injury, prosecution for the acts against Mile Kuzmanović and Čedo Marić is not barred by a limitations period.

* * * * *

Overall, the statutes of limitations do not bar Bašić's extradition to Bosnia.

*2. Bosnia satisfied the Treaty's procedural requirements.*

Bašić alleges that the United States cannot extradite her pursuant to the Treaty absent a formal charge. Bašić notes that the Treaty applies to individuals who have "been charged with or convicted of" one of the enumerated crimes, The Treaty, *supra*, art. I, and that, if an individual is merely charged with a crime, the requesting country must submit "a duly authenticated copy of the warrant of arrest," *id.*, art. III. Bašić asserts that she is not subject to extradition under the Treaty because Bosnia has not submitted a formal warrant of arrest.

An arrest warrant is merely a document stating that the government has probable cause that an individual committed a crime. U.S. Const. amend. IV. Outside the United States, documents with different names and different forms may be used for the same purpose. *Grin*, 187 U.S. at 190–91. These documents are considered "equivalent judicial

document[s]," and a requesting country may rely upon judicial equivalents when submitting a petition for extradition. *Id.*

By design, the American courts should broadly accept documents that a requesting country identifies as judicial equivalents. *See, e.g.*, *id.* (finding that a document without the same procedural safeguards satisfies the extradition treaty's warrant requirement); *Skaftouros*, 667 F.3d at 156 (noting that the principles of international comity and judicial modesty encourage deference to foreign determinations of foreign law—especially concerning whether a foreign document constitutes a judicial equivalent); *Assarsson*, 635 F.2d at 1244 (encouraging international respect of relevant procedural frameworks); *Jhirad*, 536 F.2d at 484–85 (same).[11]

Here, Bosnia has not produced a document titled "arrest warrant," but Bosnia has produced an Order and a Decision from the District Court in Doboj. 5:11-5002 DE 39-2 at 16–17. The Order and Decision are the judicial equivalent to an arrest warrant because the documents create the factual findings akin to probable cause and the Bosnian Minister of Justice, Bosnian Office of the Prosecutor, and Doboj Prosecutor note that these documents act as an arrest warrant. (5:11-5002 DE 25-2 at 1 (Doboj Prosecutor's Affidavit)); (5:11-5002 DE 37-1 at 1–2 (Statement on Behalf of the Ministry of Justice and Prosecutor's Office)). Therefore, Bosnia has satisfied the warrant requirement under the Treaty.

**D. Evidence exists warranting the finding that there were reasonable grounds to believe the accused guilty.**

Bašić contends that the evidence supporting Bosnia's extradition request is insufficient to establish every element of the crimes for which Bosnia seeks extradition.

---

[11] Such judicial modesty is appropriate. International extradition does not adjudicate guilt or innocence, and the Federal Rules of Criminal Procedure and the Federal Rules of Evidence are expressly inapplicable. *Skaftouros*, 667 F.3d at 155 n.16; *see also Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164–65 (11th Cir. 2005) (emphasizing the difference between a criminal prosecution and an extradition proceeding).

Specifically, Bašić reiterates two arguments that she had presented before the magistrate: that the alleged victims were members of the military and that the evidence did not properly establish Bašić's identity as the alleged perpetrator.

But habeas proceedings are not a means for rehearing evidence previously argued before the magistrate. *Fernandez*, 268 U.S. at 312. Habeas proceedings determine whether there is *any* evidence supporting the magistrate's conclusion that there is probable cause to believe the accused guilty of the crimes for which the requesting country seeks extradition. *Id*. The magistrate's conclusion is supported if there is *any* "competent and adequate" evidence. *Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (citing *McNamara v. Henkel*, 226 U.S. 510, 523 (1913)). Finding any competent and adequate evidence is a "lenient standard." *Demjanjuk*, 776 F.2d at 576.

### 1. Competent and adequate evidence supports the conclusion that the victims qualify as civilians under Bosnian law.

Bašić reasserts that the victims were not "civilians" under Bosnian law and, thus, Bosnia's legal bases for requesting Bašić's extradition—Article 173 of the Criminal Code of Bosnia and Herzegovina and Article 142 under the Criminal Code of the former Socialist Republic of Yugoslavia—are insufficient. Bašić alleges that the victims were members of the Serbian military and notes that certain evidence contradicts the Magistrate Judge's finding that the victims were civilians or "part of a loose defensive organization." *Basic*, *supra*, at *12.

But Bašić requests this Court reexamine a factual issue previously determined by the Magistrate Judge. Both Bašić and the Magistrate Judge note that there is evidence for and against the conclusion that the victims were members of the Serbian military but the habeas standard does not permit this Court to reweigh the Magistrate Judge's factual

conclusions. *Fernandez*, 268 U.S. at 312 ("[habeas corpus] is not a means for rehearing what the magistrate already decided"); *see also Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008) (noting that the standard of review with respect to factual issues is extremely deferential). Rather, this Court must determine whether *any competent and adequate* evidence supports the Magistrate Judge's conclusion. *Demjanjuk*, 776 F.2d at 576.

Here, the Magistrate Judge found "probable cause to believe that the victims qualify as civilians." *Basic*, *supra*, at *12. In reaching this conclusion, the Magistrate Judge relied upon testimony from *five* different witnesses that indicated that the individuals taken to the YNA Centre in Derventa were targeted because they were Serbs, not because they were alleged to be members of the Serbian military. *Id.* Every witness testified under oath, and the witnesses' statements provided a consistent account of the events. (5:11-5002 DE 1-11 at 59 (Statement of Lazic) ("[The Croatian units] threat[ened] that Serbs could not live in Derventa, and that they would all be killed or driven away.")); (5:11-5002 DE 1-11 at 64 (Statement of Kovacevic) ("[F]rom that moment onwards the harassment of the citizens of Serb nationality started. . . . The Croats started supplying themselves with arms, issuing threats to Serbs that they would make them move away, and if they did not accept that, they would kill them.")); (5:11-5002 DE 1-11 at 68 (Statement of Kuzmanovic) ("Croat and Muslim units started attacking the settlement Cardak in the first half of April because the majority of population there was of Serbian nationality.")); (5:11-5002 DE 1-11 at 88 (Statement of Vidovic) (noting that he and Blagoje Đuraš were members of an "armed resistance" protecting Čardak but that they were captured and taken—along with women and children—to the YNA Centre in Derventa)); (5:11-5002 DE 1-11 at 115 (Statement of Vojnovic) (discussing the conditions at the YNA Centre and noting that the YNA Centre

21

was filled with Serbs)).[12] This evidence is competent and adequate; therefore, this Court will not upset the Magistrate Judge's conclusion that the victims were not military members.

> 2. *Competent and adequate evidence supports the conclusion that Bašić perpetrated the alleged crimes.*

Bašić also reargues that Bosnia did not sufficiently establish proof that she committed the alleged crimes. Bašić notes that the Department of State requested additional documentation confirming that Bašić committed the alleged crimes; however, Bašić misconstrues the Department of State's initial diligence as a "rejection" of Bosnia's original extradition request. (DE 18 at 39).

Here, the Magistrate Judge analyzed the sufficiency of evidence concerning Bosnia's identification procedures. *Basic*, *supra*, at *4, 9. The Magistrate Judge evaluated witness testimony and evidence from Bosnia's subsequent photographic line-up, and the Magistrate Judge determined that Bosnia had produced sufficient evidence to establish probable cause that Bašić committed the alleged crimes. *Id.* The Magistrate Judge noted that Bašić's arguments may have merit but that her arguments "must await a merits resolution." *Id.*, at *13. This Court finds that the testimonial and photographic line-up evidence is competent and adequate and will not disrupt the Magistrate Judge's finding that Bosnia's evidence concerning identification satisfies their probable cause burden.

## E. The rule of specialty is inapposite.

In support of her petition, Bašić also argues that the rule of specialty prohibits extradition. Under the rule of specialty, the requesting country can only prosecute the extraditee for crimes listed in the extradition petition. *Demjanjuk*, 776 F.2d at 583; *see also*

---

[12] There are many other corroborating witness statements in the record, but the Court's role is merely to examine whether the evidence that the magistrate relied upon was competent and adequate to support the magistrate's conclusion. *Bingham*, 241 U.S. at 517.

*United States v. Rauscher*, 119 U.S. 407, 430 (1886) (holding that in the extradition context, a person "can only be tried for one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition").

Bašić notes that the United States and Bosnia have certified that, if extradited, Bašić will be prosecuted under Article 142 of the Criminal Code of the Socialist Federal Republic of Yugoslavia. Bašić asserts that prosecution under Article 142 would violate the rule of specialty because Bosnia's extradition request only charges Bašić with violating Article 433 of the Criminal Code of the Republic of Srpska and Article 173(1) of the Criminal Code of Bosnia and Herzegovina. The Court rejects this argument.

*1. Bašić's rule of specialty argument is premature.*

The rule of specialty applies to an extraditee's prosecution *in the requesting country*. *See, e.g.*, *Rauscher*, 119 U.S. at 430 (noting that the rule of specialty applies after extradition); *United States v. Stokes*, 726 F.3d 880, 888–89 (7th Cir. 2013) (examining *Rauscher* and holding that an extraditee may have standing under the rule of specialty but that the rule only applies after a person has been extradited); *Demjanjuk*, 776 F.2d at 583 (comparing the crimes alleged in the extradition petition and the crimes charged by the requesting country).[13] Further, the Treaty states that "[n]o person surrender*ed* by either of the high contracting parties" shall be tried for a crime other than the crimes declared in the extradition request. The Treaty, *supra*, art. VIII (emphasis added). The rule of specialty only applies *after* an extraditee is surrendered to the requesting country. Therefore, Bašić's argument is premature.

---

[13] The Court notes that it is not clear if the rule of specialty may apply because Bašić is charged with the same *crimes*—murder and torture—under Articles 142, 173(1), and 433. *See, e.g.*, *Demjanjuk*, 776 F.2d at 583 (analyzing the rule of specialty by comparing the charged offenses with the offenses listed in the extradition treaty); *Kaiser v. Rutherford*, 827 F. Supp. 832, 835 (D.D.C. 1993) ("[T]he doctrine of specialty simply requires that the prosecution be based on the same facts as set forth in the request for extradition and the charges must be extraditable offenses under the Treaty.").

*2. The United States has consented to prosecution under Article 142.*

The rule of specialty is a doctrine grounded in international comity. *United States v. Lomeli*, 596 F.3d 496, 500–01 (8th Cir. 2010); *United States v. Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007). "Because of this, the protection [of specialty] exists only to the extent that the surrendering country wishes." *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986); *see also United States v. Jetter*, 722 F.2d 371, 373 (8th Cir. 1983) (holding that the surrendering country determines whether a prosecution breaches the rule of specialty). The surrendering country may, however, waive the rule of specialty. *See, e.g.*, *United States v. Stokes*, 726 F.3d 880, 889 (7th Cir. 2013) (collecting cases); *Berenguer v. Vance*, 473 F. Supp. 1195, 1197 (D.D.C. 1979) (holding that the rule of specialty does not apply if the "asylum country consents"). If the surrendering country waives the rule of specialty, then the extraditee may not assert a claim under the rule of specialty. *See, e.g.*, *Rauscher*, 119 U.S. at 424–25 (affirming that a potential extraditee's rights has jurisdiction to raise defenses that a surrendering country could raise); *Najohn*, 785 F.2d at 1422 (holding that a potential extraditee's right of specialty is coextensive to the surrendering country's).

Here, even if the rule of specialty applies, the United States has waived the doctrine. The United States has consented to Bašić's extradition for murder and torture under Articles 142, 173(1) and 433. Because the United States has waived the rule of specialty, Bašić cannot claim its protection.

## III. Conclusion

In a habeas proceeding seeking collateral review of an extradition order, the habeas petitioner bears the burden of demonstrating that she is being held in violation "of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Bašić bears the burden of demonstrating that the extradition certification violated either the

extradition treaty with Bosnia or the federal extradition statute. For the reasons stated above, this Court concludes that Bašić has not met this burden.[14]

Accordingly, **IT IS ORDERED** that Bašić's petition for a writ of habeas corpus (DE 1) is **DENIED**.

Dated July 9, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

---

[14] The Court is not unsympathetic to Bašić's contentions; however, the Court notes that Bašić's arguments are best directed to the Secretary of State or as a defense on the merits in Bosnia. *See, e.g.*, *Ordinola v. Hackman*, 478 F.3d 588, 606–07 (4th Cir. 2007) (Traxler, J., concurring) (noting the limited role that the judiciary plays in the extradition process and that "the decision whether to surrender a person found eligible for extradition remains a discretionary one committed to the executive branch"); *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006) (stating that the judiciary's role in an international extradition proceeding is limited to determining whether an individual is eligible for extradition and that the executive branch ultimately decides whether to surrender the individual).

25